United States District Court
Southern District of Texas
**ENTERED**
August 10, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BULBS 4 EAST SIDE, INC.; dba JUST BULBS, | § § § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:14-CV-3672 |
| | § | |
| GREGORY RICKS, *et al*, | § § | |
| Defendants. | § | |

## ORDER AND OPINION

Before the Court are Plaintiff's Motion for Summary Judgment (Document No. 26), Defendant's Motion for Summary Judgment (Document No. 33), and the parties' responses and replies (Document Nos. 35, 36, 37). Having considered these filings, the facts in the record, and the applicable law, the Court concludes that both Motions will be granted in part and denied in part.

**Background**

Plaintiff Bulbs 4 East Side Inc., d/b/a Just Bulbs ("Just Bulbs" or "Plaintiff") is a "leading supplier of light bulbs of all shapes and sizes." (Document No. 1 at 1). Just Bulbs[1] is currently operated by David Brooks ("Brooks") and it "owns, and has used for more than 34 years [since 1983], the federally registered service mark JUST BULBS in connection with its retail services."

---

[1] Plaintiff details the history of the company and the trademark as follows:
As duly recorded with the United States Patent and Trademark Office ("USPTO"): (a) Just Bulbs Ltd. applied for, and on April 12, 1983 received, registration for the service mark JUST BULBS (see Ex. A); (b) Just Bulbs Ltd. merged with Superiority Inc., and provided to Superiority authorization to use JUST BULBS, as of August 15, 1995; (c) pursuant to such authorization, by assumed name certificate dated December 27,1995, Superiority Inc. was "doing business as" JUST BULBS; and (d) by assignment dated October 13, 2008, Just Bulbs Ltd. assigned the registration for JUST BULBS to plaintiff, Bulbs 4 East Side Inc. True and correct copies of the recordations at the USPTO of the foregoing merger, assumed name certificate, and assignment documents are annexed and made Exhibit B hereto.
(Document No. 1 at 3 and Exhibit B).

(Document No. 26 at 2, 5). Plaintiff registered and used the domain name www.justbulbs.com (the "Domain Name") from 1998 to 2003. *Id*. at 9. However, Plaintiff could not renew the Domain Name in 2003 due to issues with its registrar, AT&T, and so let the Domain Name expire, planning to re-purchase it the next day. *Id*. at 9-10. When Plaintiff attempted to re-purchase the Domain Name, Plaintiff discovered that Defendant Gregory Ricks[2] ("Ricks" or "Defendant") had purchased it, and was using it in connection with light bulbs. *Id*. Under Defendant's ownership, entering the Domain Name takes consumers to a website that "provides advertising and hyperlinks to other retailers selling light bulbs." *Id*. Defendant is paid when consumers click on these ads. *Id*. Plaintiff alleges that Defendant "is a serial cybersquatter who has registered or purchased (that is, obtained after someone else initially registered) between 5,000 and 10,000 domain names" and that Defendant "has been a party to at least 17 federal lawsuits (the vast majority of which resulted in his transferring the disputed domain names to the complainant) and 20 domain name arbitrations alleging trademark infringement and cybersquatting against him." *Id*. at 2.

In its Complaint, Plaintiff details its attempts, prior to this lawsuit, to retain the domain name. Plaintiff filed two unsuccessful complaints against Defendant with the World Intellectual Property Organization ("WIPO"). In 2003, Plaintiff's predecessor-in-interest[3] filed the first complaint, *Superiority. Inc. d/b/a Just Bulbs v. none/Motherboards.com* [controlled by Ricks], WIPO Case No. D2003-049I ("*Superiority*"), "in accordance with the Uniform Domain Name Dispute Resolution Policy (the "Policy"), approved by the Internet Corporation for Assigned

---

[2] Plaintiff alleges that Ricks sometimes operates "under the name of businesses which hide his identity." (Document No. 26 at 7). For example, the Domain Name was purchased by "motherboards.com." *Id*. at 10. For the sake of clarity, the Court will refer to Defendant as "Ricks" throughout.

Plaintiff also has filed its claims against defendants "does 1 through 10," who "cannot yet be known," but who it alleges are "the agents, partners, joint-ventures, co-conspirators, owners, principals, successors, and predecessors of Ricks and are in some manner responsible or legally liable for the events, actions, transactions, and circumstances alleged herein." (Document No. 1 at 2). However, the motions at issue only concern Defendant Ricks.

[3] Plaintiff's predecessor-in-interest is Superiority Inc. *See* fn. 1 *supra*.

Names and Numbers ("ICANN")." (Document No. 1 at 3). However the WIPO panel denied the

complaint:

> 13. [] The panel found that plaintiff had not proven that the respondent lacked legitimate interests in respect of the Domain Name, because although the respondent initially was selling light bulbs, it used "Just Bulbs" in its descriptive sense and there was no evidence that, at the time of the Domain Name registration, the respondent was aware of the plaintiff's JUST BULBS service mark. The panel in the *Superiority* case also noted that the respondent there "evinced good faith by removing light bulb advertisements from its site subsequent to being notified of the dispute" and commencing to advertise flower bulbs at the website. Accordingly, the panel held, "Respondent has a legitimate interest in using the domain name for flower bulbs."
>
> 14. The panel in *Superiority* further observed that "this is not a case where Respondent is deliberately benefitting from the use of the trademark meaning of JUST BULBS by funneling traffic to its site," and therefore concluded as follows: "Since Respondent has represented that it will not resume advertising light bulbs, Respondent's use of the domain name as a portal for customers interested in flower bulbs is sufficient to demonstrate a legitimate interest and a *bona fide* use of the domain name."

*Id*. at 3-4. Ten years later, in 2013, Plaintiff filed another complaint against Defendant, WIPO

Case No. D2013-1779, due to new information, including the fact that Defendant was again

using the site to advertise lightbulbs, rather than flower bulbs:

> 17. In the second WIPO complaint, plaintiff argued that defendant engaged in bad faith as shown by the following:
>> (a) Defendant Gregory Ricks ceased using JUST BULBS for flower bulbs (a central fact in the *Superiority* decision) and has been using JUST BULBS for light bulbs (the same goods and services that are the subject of plaintiff's registered trademark);
>> (b) At the time it commenced use of the Domain Name for plaintiff's goods, defendant Ricks knew of plaintiff's trademark, goods and services from having participated in the *Superiority* case, but chose to use the Domain Name in connection with goods and services identical to plaintiff's;
>> (c) Defendant Ricks effectively re-registered the Domain Name because during the pendency of the *Superiority* case he moved the Domain Name registration from one privacy or proxy service (Namesecure.com) to another (Internet.bs Corp.); and
>> (d) At that time, defendant Ricks repeatedly engaged, over the course of the eleven years ensuing since the *Superiority* case, in similarly moving domain name registration from one privacy or proxy service to another, as set forth in no less than 148 WIPO UDRP cases in which he was the respondent.
>
> 18. The WIPO panel in the second case denied the complaint. It held that defendant's movement from one privacy/proxy service to another did not result in a "new"

registration because the record otherwise showed that the same party maintained the ownership of the Domain Name registration.

19, Thus, the WIPO panel limited its inquiry, pursuant to the ICANN Policy, to whether the domain name was registered in bad faith; determined that defendant's initial registration of the Domain Name was not in bad faith, as set forth in the *Superiority* case; and rejected plaintiff's UDRP complaint.

20. However, the WIPO panel in the second decision held that "Respondent is now using the Domain Name in bad faith, since today Respondent is clearly aware of Complainant's mark [from arbitration of the *Superiority* case]."

*Id*. at 4-5. In denying the second complaint, the panel suggested that Plaintiff seek its relief elsewhere, as it was not "the appropriate vehicle" for resolving the dispute. *Id*. at 5. Therefore, Plaintiff filed this suit, alleging (1) infringement of federally registered trademarks, pursuant to 15 U.S.C. § 1114, (2) violations of Federal Trademark and Unfair Competition Law, 15 U.S.C. § 1125(a), (3) violations of the Federal Anti-Dilution Law, 15 U.S.C. § 1125(c), (4) violations of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), (5) injury to business reputation or trade name under Texas Business & Commerce Code § 16.29, and (6) trademark infringement and unfair competition under Texas common law. *Id*. at 9-13.

**Standard of Review**

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewing the evidence in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In a trademark case, "[a]lthough the secondary meaning of a mark and the likelihood of confusion are ordinarily questions of fact, summary judgment may be upheld if the summary judgment record compels the conclusion that the movant is entitled to

judgment as a matter of law." *Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 474 (5th Cir. 2008) (internal citations omitted) (hereinafter "*Smack Apparel*").

**Analysis**

*Federal Trademark Infringement*

"To recover on a claim of trademark infringement, a plaintiff must first show that the mark is legally protectable and must then establish infringement by showing a likelihood of confusion." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008).

*Legally protectable mark*

Plaintiff registered the Just Bulbs mark on April 12, 1983. (Document No. 1, Exhibit A at 1). This registration is "admissible in evidence" and is "*prima facie* evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein." 15 U.S.C. § 1115. However, Plaintiff's registration "shall not preclude another person from proving any legal or equitable defense or defect" in its registration. *Id*.

In addition to the registration of the mark, Plaintiff argues that the mark has become incontestable pursuant to 15 U.S.C. § 1065. Section 1065 states that "the right of the owner to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable." 15 U.S.C. § 1065. Plaintiff has demonstrated that "Just Bulbs has used the mark in connection with the services specified in the registration (retail store service specializing in light bulbs) for more than five

continuous years after the registration date," pursuant to this statute. (Document No. 26 at 16-17; Document No. 26, Exhibit A, at 5; Document No. 37-3, Section 8 & 15 Declaration).[4]

Defendant does not directly argue that Plaintiff's mark is not incontestable, but Defendant does list the affirmative defense of genericism[5] in its Motion for Summary Judgment. (Document No. 33 at 1). "It is important to note that while genericness is not on the § 33(b) list [of exceptions to incontestability], Lanham Act § 15(4) specifically mandates that no incontestable right shall be acquired in a generic name. Lanham Act § 15 is incorporated by reference by the first sentence of § 33(b)." McCarthy on Trademarks and Unfair Competition § 32:149 (4th ed.) (citations omitted) (hereinafter "McCarthy"). Therefore, the Court will consider whether the Just Bulbs mark is generic, in order to determine whether the mark is incontestable.

A generic term "refers to an entire class of products (such as 'airplane' or 'computer'), does not distinguish a product at all, and therefore receives no protection under trademark law." *Mar. Madness Athletic Ass'n, L.L.C. v. Netfire, Inc.*, 310 F. Supp. 2d 786, 808 (N.D. Tex. 2003) (citations omitted). "The test for genericness is whether the public perceives the term primarily as the designation of the article." *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 538 (5th Cir. 2015) (citations omitted). Clearly the term "Just Bulbs" is not generic, as there are multiple other ways to designate a store selling primarily light bulbs. Furthermore, the Court agrees with Plaintiff that while "bulbs" on its own could be generic, as referring to an entire class of products, it may become a trademark when taken together with "just." (Document No. 26 at 30) (citing *Sugar Busters, LLC v. Brennan*, 177 F.3d 258, 269 n. 6 (5th Cir. 1999); *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1041 (D.C. Cir. 1989); *Service Merch. Co. v. Serv. Jewelry Stores*, 737 F. Supp. 983, 999 (S.D. Tex. 1990)). Therefore

---

[4] Defendant does not dispute that the mark has been used continuously by Plaintiff for more than five years.
[5] Defendant merely lists this defense, but nowhere in its motions does it provide additional argument. For the sake of thoroughness, however, the Court will briefly consider this defense.

the mark "Just Bulbs" is not generic. As Plaintiff has demonstrated that the mark has been in continuous use for five years, and Defendant makes no other objections to the incontestability of the mark, the Court finds that the mark is incontestable. Once a mark has become incontestable under § 1065, "the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b). Therefore, subject to affirmative defenses, discussed below, Plaintiff has conclusively established that it owns a legally protectable mark.

"Trademarks [] are classified into the following categories: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful." *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 540 (5th Cir. 1998). Plaintiff's mark "Just Bulbs" is descriptive, because it "identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients." *Id*. The word "bulbs" identifies the product sold by Plaintiff, while "just" is an adverb describing the store's focus on only bulbs. *Quantum Fitness Corp. v. Quantum LifeStyle Centers, L.L.C.*, 83 F. Supp. 2d 810, 817 (S.D. Tex. 1999) ("In many cases, a descriptive term will be an adjective such as speedy, friendly, green, menthol, or reliable.") (internal quotations and citations omitted). A descriptive mark "is protectible only when it has acquired a secondary meaning in the minds of the consuming public." *Pebble Beach*, 155 F.3d at 540.

The following factors are relevant to a trademark's secondary meaning: "(1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in

copying the [trademark]." *Id*. at 541. Plaintiff has provided convincing evidence[6] as to several of these factors:

> (1) Plaintiff has used JUST BULBS continuously since at least 1981, some 34 years ago, advertising and garnering clients throughout the United States. Brooks[7] ¶¶ 8-10, 16, Ex. A-5, A-6;
>
> (2) Annual sales in the last eight years, for example, have increased every year to nearly $1.4 million, and in any event, are much greater than Defendant's sales ($1,300).[8] Brooks ¶ 14; Ex. B at 101:1-16;
>
> (3) Over the same time period, annual advertising expenses have grown to $70,000, totaling almost $300,000. Such advertising has been through Plaintiff's website (www.justbulbsnyc.com), consumer magazines like Bella, and trade magazines like Residential Lighting, the latter of which has garnered inquiries from and sales to customers of lighting fixture stores throughout the country. Brooks ¶¶ 13-14 and Ex. A-3, A-4;
>
> (4) Since opening in 1981, Just Bulbs has enjoyed unsolicited, nationwide media coverage, including the David Letterman Show, articles in the New York Times, the New York Daily News and New York Magazine, and a variety of trade publications. Brooks ¶ 11 and Ex. A-2; []

(Document No. 26 at 17). The fact that Plaintiff has undisputedly used the mark for more than 30 years, combined with its extensive sales, advertisements, and media coverage, is sufficient to demonstrate secondary meaning.

Plaintiff also argues that Defendant's intent demonstrates secondary meaning:

> Ricks' intent is shown by his actual knowledge of Plaintiff's registration since receiving the 2003 WIPO proceeding complaint; he stopped using the Domain Name for light bulbs during that arbitration; re-commenced use of the Domain Name for light bulbs after the 2003 WIPO proceeding; and continued using the Domain Name for light bulbs after the 2013 WIPO proceeding. Thus, Ricks intended to use www.justbulbs.com in violation of Plaintiff's trademark rights, despite actual knowledge of such.

---

[6] Defendant does not specifically dispute that Plaintiff's mark has acquired secondary meaning, nor does he dispute this evidence.

[7] This refers to the Declaration of David Brooks, Document No. 26, Exhibit A.

[8] Plaintiff also cites to *Dallas Cowboys Football Club, Ltd. v. Am.'s Team Properties, Inc.*, for the proposition that the fact that its sales are substantially more than Defendant's weighs in favor of secondary meaning. 616 F. Supp. 2d 622, 636 (N.D. Tex. 2009). *See also Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 544 (5th Cir. 2015) (Court noted that sales of approximately $30,500 were "low compared to the sales of products bearing marks that we have found to have secondary meaning," which included cases where sales consisted of "916,385 cases of Fish–Fri between 1964 and 1979" and where recent sales exceeded $93 million.) (citing *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 795-6 (5th Cir. 1983); *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008)).

*Id.* The Court agrees with Plaintiff that after the initial WIPO proceeding, Defendant was aware of Plaintiff's trademark, and the fact that it related to lightbulbs. During the initial WIPO proceeding, Defendant agreed to use his website only to sell flower bulbs, as a showing of good faith.[9] (Document No. 26, Exhibit A-7, at 7). The fact that Defendant resumed selling lightbulbs after this, despite awareness of Plaintiff's trademark and his own representation that he would cease doing so, strongly suggests intentional infringement. Defendant's claim that he "never read the entirety of the 2003 WIPO decision" does not change this outcome. (Document No. 36 at 9). Even if Defendant never read the final opinion, he must have known of Plaintiff's trademark regarding light bulbs in order to file his reply to the complaint. (Document No. 26, Exhibit A-7, at 2). Furthermore, Defendant himself represented to the panel that he would "not resume advertising light bulbs," obviously demonstrating his awareness. *Id.* at 7. "Courts have recognized that evidence of intentional copying shows the strong secondary meaning of [a product] because there is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence." *Berg v. Symons*, 393 F. Supp. 2d 525, 554 (S.D. Tex. 2005) (internal quotations and citation omitted). Therefore, this factor also weighs in favor of secondary meaning.

In addition to the incontestable status of the mark, it has also gained secondary meaning in the eyes of the public. *Am. Rice*, 518 F.3d at 331 n.29 ("The Lanham Act provides for incontestable status for descriptive marks."). *See also* McCarthy § 15:35 ("If a mark has become 'incontestable' […] it is conclusively presumed either that the mark is nondescriptive, or if descriptive, has acquired secondary meaning.") (citing 15 U.S.C. § 1115(b)). Although secondary meaning is typically a question of fact, the Court believes that Plaintiff has

---

[9] Defendant unconvincingly claims that he never made this representation. (Document No. 36 at 9). Regardless, he was clearly aware of Plaintiff's mark and continued to infringe upon it.

demonstrated that there is no genuine issue of material fact as to the secondary meaning of Just Bulbs, due to its undisputed evidence regarding time of use, sales, advertisements and media coverage, combined with evidence that infringement after the 2003 WIPO decision was intentional. *Smack Apparel*, 550 F.3d at 474.

*Likelihood of confusion*

"Once a plaintiff shows ownership in a protectible trademark, he must next show that the defendant's use of the mark creates a likelihood of confusion in the minds of potential customers as to the source, affiliation, or sponsorship of the product at issue." *Id.* at 478 (internal citations and quotations omitted). "Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion." *Id*. The Fifth Circuit uses the following factors to determine whether a likelihood of confusion exists: "(1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5) similarity of advertising media used; (6) the defendant's intent; (7) actual confusion; and (8) degree of care exercised by potential purchasers." *Am. Rice*, 518 F.3d at 329 (internal citations and quotations omitted). "The absence or presence of any one factor ordinarily is not dispositive; indeed, a finding of likelihood of confusion need not be supported even by a majority of the ... factors." *Id*.

*(1) strength of the plaintiff's mark*

"Strength of a trademark is determined by two factors. The first factor considers where the mark falls on a spectrum: 'Marks may be classified as generic, descriptive, suggestive, or arbitrary and fanciful .... [W]ithin this spectrum the strength of a mark, and of its protection, increases as one moves away from generic and descriptive marks toward arbitrary marks.'" *Id*. at 330-31. As discussed above, Plaintiff's mark is descriptive.

The second factor is the standing of the mark in the marketplace. "A descriptive mark can become distinctive [and thus strong] if over time it has developed secondary meaning, which occurs when, in the minds of the public, the primary significance [] is to identify the source of the product rather than the product itself." *Id*. As detailed above, Plaintiff's mark has developed secondary meaning in the marketplace, and is incontestable. Therefore Plaintiff's mark is strong. *Id*. This factor weighs in favor of Plaintiff.

### (2) similarity of design between the marks

The parties do not dispute that the terms are virtually identical. (Document No. 26 at 18; Document No. 36 at 7). This factor falls in favor of Plaintiff.

### (3) similarity of the products

Plaintiff argues that "Defendant promotes, through links to Plaintiff's competitors and advertisements, some of the same goods and services as Plaintiff – that is, light bulbs (although Plaintiff also provides consulting, installation and repair services)." (Document No. 26 at 18-19). In response, Defendant insists that he sells nothing, but merely "provides links and information based on the plain meaning of the word bulbs." (Document No. 36 at 7). However, Defendant ignores the fact that many of his links are to sellers of lightbulbs, directly competing with Plaintiff. Although Defendant does not sell the lightbulbs himself, he provides links to those who do. This creates confusion in a consumer's mind as to the source of the bulbs purchased via his website; a consumer who goes to justbulbs.com "could reasonably assume that the website is owned or operated by an agent affiliated" with Just Bulbs. *In re Gharbi*, No. 08-11023-CAG, 2010 WL 1544294, at *5 (Bankr. W.D. Tex. Apr. 19, 2010). This factor falls in favor of Plaintiff. *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 229 (5th Cir. 2009) ("The greater the similarity between the products and services, the greater the likelihood of confusion.").

11 / 30

*(4) identity of retail outlets and purchasers*

Plaintiff argues that "Defendant does not appear to have any retail outlets, so the 4th digit does not apply." (Document No. 26 at 19). In response, Defendant argues that his lack of retail outlets "means that this factor should be decided in Defendant's favor as no potential customer could possibly be confused if there are no retail outlets or purchasers." (Document No. 36 at 8). The Court finds that this factor is neutral. The fact that Defendant does not have retail outlets or direct purchasers does not necessarily decrease the likelihood of confusion; Defendant would need to show dissimilarities between retail outlets and customers to lessen the possibility of confusion. *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 262 (5th Cir. 1980).

*(5) similarity of advertising media used*

Plaintiff argues that "[b]oth Just Bulbs and Ricks advertise through the internet." (Document No. 26 at 19). In response, Defendant states that he "does not advertise at all" and that the "only way to find Defendant's Domain Name is to type in the actual Domain Name into the url of an internet Browser." *Id*. However, Defendant has links to several other lightbulb sellers on the website, thereby also advertising using the internet. The fact that Defendant is advertising for third parties, not himself, is irrelevant. Furthermore, "simultaneous use of the Internet as a marketing tool exacerbates the likelihood of confusion, given the fact that entering a web site takes little effort—usually one click from a linked site or a search engine's list; thus, Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership." *Audi AG v. D'Amato*, 469 F.3d 534, 543-44 (6th Cir. 2006) (internal quotations and citations omitted). This factor weighs in favor of Plaintiff.

*(6) the defendant's intent*

Plaintiff states that Ricks has demonstrated negative intent, because Ricks continues to use the Domain Name to advertise lightbulbs, despite knowledge from the WIPO proceedings of Plaintiff's similar business and its trademark on the phrase Just Bulbs. (Document No. 26 at 17). Defendant states that "Defendant had no knowledge of the Plaintiff at time of registration and no notice of their continued disapproval of the usage until over a decade later. Registration and use was in good faith and its only intended use has been to supply information and links based on the plain meaning of the word bulbs." (Document No. 36 at 8) (citing Declaration of Gregory Ricks, ¶ 13, 14).

"Proof of the defendant's intent to benefit from the good reputation of the plaintiff's products is not required in order to establish infringement. If such intent can be shown, however, it may provide compelling evidence of a likelihood of confusion." *Am. Rice*, 518 F.3d at 332 (citations omitted). "Direct proof of bad faith is rarely present. Nor does an inference of bad faith necessarily arise from the junior user's knowledge or awareness of the senior user's trademark. The proper focus is whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff." *Quantum Fitness*, 83 F. Supp.2d at 828.

Plaintiff focuses on Defendant's knowledge that he is infringing upon their trademark. The Court agrees that the first WIPO proceeding put Defendant on notice of the existence of Plaintiff's mark, and of the fact that using his website to sell lightbulbs would infringe upon Plaintiff's trademark. (Document No. 26, Exhibit A-7). However, this fact does not necessarily demonstrate bad faith, or that Defendant intended to benefit from Plaintiff's goodwill. *Quantum Fitness*, 83 F. Supp. 2d at 828. *See also Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 151 n.2 (5th Cir. 1985) ("A showing that the defendant intended to use the allegedly

infringing mark with knowledge of the predecessor's mark may give rise to a presumption that the defendant intended to cause public confusion as to the source or sponsorship of the product or service. The same showing, however, does not give rise to a presumption that the defendant intended to appropriate the plaintiff's goodwill from its use of the allegedly infringing mark.") (citations omitted).

Furthermore, "the intent of defendants in adopting (their mark) is a critical factor, since if the mark was adopted with the intent of deriving benefit from the reputation of (the plaintiff,) that fact alone may be sufficient to justify the inference that there is confusing similarity." *Am. Rice*, 518 F.3d at 332 (citations omitted). In this case the WIPO panel found that Defendant did not exhibit bad faith when he first purchased the Domain Name. (Document No. 26, Exhibit A-7, at 6-11). Therefore the Court finds that this factor does not weigh in favor of likelihood of confusion.

### (7) actual confusion

Plaintiff submits the testimony of Brooks as evidence of actual confusion. (Document No. 26 at 19). "Brooks testified in his deposition about instances of actual confusion: potential customers had contacted Plaintiff and complained that goods they had ordered through 'the website' were defective. Brooks knew that the consumers had gone to Defendants' Website rather than Plaintiff's, because Plaintiff advertises but does not sell goods through website." *Id*. at 19-20 (citing Document No. 26, Exhibit A, at ¶ 31). Defendant objects to this evidence as "anecdotal" and states that "Defendant does not sell goods from its website [] it is therefore impossible to confuse the two entities." (Document No. 36 at 9).

The Court disagrees with Defendant that it would be impossible to confuse the two entities; a consumer could have purchased a faulty product from one of Defendant's links, thinking that Just Bulbs sold that product. However, Brooks' testimony does not demonstrate

that he had any personal knowledge of actual confusion; he merely heard about confusion and made an assumption as to its source. Without more, there is insufficient evidence to demonstrate actual confusion. However, "[a]lthough actual confusion is the 'best evidence' of confusion, it 'is not necessary to a finding of likelihood of confusion.'" *Am. Rice*, 518 F.3d at 333.

(8) degree of care exercised by potential purchasers

Neither party addresses this factor. (Document No. 26 at 19-20; Document No. 36 at 9). Therefore the Court will not consider it.

Plaintiff has demonstrated that there is a possibility of confusion between its products, and products advertised on Defendant's website. As discussed above, a consumer could think that Defendant's website is authorized or run by Plaintiff, creating confusion as to the source of the lightbulbs. However, likelihood of confusion requires a showing of *probability* of confusion, not a mere *possibility*. *Smack Apparel*, 550 F.3d at 478 (citations omitted). It is also possible that consumers who mistakenly go to Defendant's website would not be confused as to the source of the lightbulbs sold there. Without conclusive evidence of Defendant's bad faith intent, or actual confusion, the Court is reluctant to find likelihood of confusion at this stage in the litigation. Likelihood of confusion is usually a question of fact, and in this case is best reserved for a jury. *Id.* at 474.

*Defenses*

Once incontestable, a mark is subject only to the following defenses or defects:

1. Fraud in obtaining the registration or the status of incontestability;
2. Abandonment;
3. Use of the mark to misrepresent source;
4. "Fair use" of the mark;
5. Limited territory defense of an intermediate junior user;
6. Prior registration of defendant;
7. Use of the mark to violate federal antitrust law; and
8. That the mark is functional; or
9. Equitable defenses such as laches, estoppel and acquiescence.

McCarthy § 32:149 (citing 15 U.S.C. § 1115(b)) (other citations omitted). Of these applicable defenses, Defendant asserts the defenses of laches, statute of limitations, and the "fair descriptive use defense." (Document No. 33 at 4-8); (Document No. 36 at 19-24).

*(1) laches*

Defendant argues that laches prevents Plaintiff's claim of infringement, because Plaintiff has known of his website since 2003, and Plaintiff's delay in filing suit caused prejudice to him. (Document No. 33 at 6). This prejudice is Defendant's inability "to recover many documents which might have been able to show conclusively that the allegations brought by the Plaintiff were conclusively false or which established defendant's defenses." *Id*. at 7. Furthermore, "many of the third parties that Defendant employed over the past twelve years have gone out of business [or] are unable to testify." *Id*.

In response, Plaintiff states that Ricks was on notice of these claims due to the WIPO arbitration decisions, and therefore "cannot assert that he was unfairly surprised by this lawsuit." (Document No. 37 at 9). Plaintiff also argues that Defendant does not have the "clean hands" required to assert the defense of laches, and that Defendant has not demonstrated any undue prejudice. (Document No. 35 at 13).

"Laches is an inexcusable delay that results in prejudice to the defendant. Laches comprises three elements: (1) delay in asserting one's trademark rights, (2) lack of excuse for the delay, and (3) undue prejudice to the alleged infringer caused by the delay." *Smack Apparel*, 550 F.3d at 489-90 (internal quotations and citations omitted). "A defendant who intentionally infringes a trademark with the bad faith intent to capitalize on the markholder's good will lacks the clean hands necessary to assert the equitable defense." *Id*. "Any acts after receiving a cease and desist letter are at the defendant's own risk because it is on notice of the plaintiff's objection

to such acts." *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998) (citing *Conan Properties*, 752 F.2d at 151-2).

Defendant has been on notice of Plaintiff's objection to its use of the "Just Bulbs" mark since 2003, when Plaintiff filed its first WIPO complaint. (Document No. 26, Exhibit A-7, at 1). Defendant represented to the initial panel that he would cease using his website to advertise lightbulbs, but resumed doing so. *Id.* at 7. Therefore Plaintiff filed another WIPO complaint in 2013, of which Defendant was aware, as evidenced by his email to the panel. (Document No. 26, Exhibit A-8, at 1-2). The panel decided against Plaintiff in January 2014, and Plaintiff filed this lawsuit in December 2014. *Id.* at 6.

The Court finds that the defense of laches is not appropriate here, as Defendant's actions after the 2003 WIPO decision were "at his own risk," because he was aware of Plaintiff's objections to his website. *Elvis Presley Enterprises*, 141 F.3d at 205.

Also, Defendant's arguments that Plaintiff has been delaying since 2003 are completely inaccurate, because Plaintiff filed its first WIPO complaint almost immediately after discovering Defendant's website. Plaintiff then filed another complaint, after learning that Defendant had resumed advertising lightbulbs. Therefore Plaintiff has not delayed in asserting its trademark rights, but has repeatedly tried to curb Defendant's infringement.

Finally, Defendant has not demonstrated that he has suffered any undue prejudice. Plaintiff correctly notes that "Ricks does not allege what documents he allegedly cannot recover, or which witnesses he allegedly cannot reach, let alone suggest how they would allegedly support his defense," nor does he provide any evidence thereof. (Document No. 35 at 12). Unsupported allegations cannot create a genuine issue of material fact, and Defendant's failure to provide evidence of prejudice suffered "renders all other facts immaterial." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986); *Morris v. Covan World Wide Moving, Inc,*, 144 F.3d 377, 380 (5th Cir. 1998).

As Defendant was on notice of Plaintiff's objections to his website, and has not presented any evidence of undue prejudice, the defense of laches is not appropriate.[10]

### (2) statute of limitations

Defendant claims that the applicable four-year statute of limitations bars Plaintiff's claims, because Defendant's actions began in 2003. (Document No. 36 at 24). In response, Plaintiff argues that Defendant's actions have been continuous, and were "renewed" each day that the trademark was used without authorization. (Document No. 26 at 35). Therefore, Plaintiff's claims are not barred, but the statute of limitations "limits damages to those incurred as early as four years before the lawsuit was commenced." (Document No. 35 at 14).

"[A] Lanham Act violation is governed by the four year statute of limitations under Texas law." *Edmark Indus. SDN. BHD. v. S. Asia Int'l (H.K.) Ltd.*, 89 F. Supp. 2d 840, 846 (E.D. Tex. 2000) (citing Tex. Civ. Prac. & Rem. Code § 16.004; *Derrick Mfg. Corp. v. Southwestern Wire Cloth, Inc.,* 934 F.Supp. 796, 805 (S.D. Tex. 1996)). The statute of limitations begins to run from the moment that a cause of action accrues, or causes some legal injury. *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Imp. Corp.*, 53 S.W.3d 799, 812 (Tex. App. 2001) (citations omitted). However, "[a]n exception to this rule exists for continuing torts," which involve "wrongful conduct that is repeated over a period of time and each day creates a separate cause of action." *Id.* "Each subsequent violation is a separate event, separately actionable, which begins anew the running of the statute of limitations." *Id.* "Trademark infringement […] is a continuous wrong, and as such gives rise to a claim for relief as long as the infringement persists." *Two Pesos, Inc. v. Gulf Ins. Co.*, 901 S.W.2d 495, 500 (Tex. App. 1995).

---

[10] Therefore the Court does not need to consider Plaintiff's claim that Defendant has "unclean hands."

In *Horseshoe Bay*, the Texas Court of Appeals specifically found that continued use of a trademarked domain name constituted a continuing harm, giving "rise to a separate cause of action each day it [was] repeated." 53 S.W.3d at 813. Similarly, Defendant's use of Plaintiff's trademark in its Domain Name is a continuing harm.[11] Furthermore, Defendant's actions constitute a continuing harm because the links on his website "continuously changed with its providing different links to sell light bulbs;" therefore Defendant's argument that his website was a "single publication" is disingenuous. (Document No. 37 at 15). Each change of the website constitutes a separate, new harm, with its own four-year statute of limitations. This is demonstrated particularly by Defendant's change from advertising only flower bulbs to advertising light bulbs again, a substantive change to the website. The statute of limitations does not bar Plaintiff's infringement claim, but merely limits Plaintiff's damages to those occurring within four years of Plaintiff filing suit on December 23, 2014. *Derrick Mfg.*, 934 F. Supp. at 808; *Ironclad, L.P. v. Poly-Am., Inc.*, No. CIV.A. 3:98-CV-2600P, 1999 WL 826946, at *4 (N.D. Tex. Oct. 14, 1999).

---

[11] The cases cited by Defendant are inapplicable or less relevant for a number of reasons. First, some of the cases merely limit the plaintiff's damages, but do not bar the entire action. *Ironclad, L.P. v. Poly-Am., Inc.*, No. CIV.A. 3:98-CV-2600P, 1999 WL 826946, at *4 (N.D. Tex. Oct. 14, 1999) (limiting the plaintiff's Lanham Act damages to those occurring within the four-year statute of limitations); *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 337 (5th Cir. 2008) (limiting damages to defendant's profits in recent years). Plaintiff is correct that in *Edmark Indus. SDN. BHD. v. S. Asia Int'l (H.K.) Ltd.* the defendant had ceased its infringing conduct and was not liable for the more recent re-distribution of the packaging by third parties. 89 F. Supp. 2d 840, 846 (E.D. Tex. 2000); (Document No. 37 at 16). In addition, the Court was barring a common law unfair competition claim. *Id.* Furthermore, in *Bernardo Footwear, LLC v. Ashley Nettye, Inc.*, the plaintiff's claims were closely related to time-barred breach of contract claims, and the plaintiff conceded that its Lanham Act claim arose eight to ten years earlier. No. CIV.A. H-11-2057, 2012 WL 1076252, at *5 (S.D. Tex. Mar. 28, 2012); (Document No. 37 at 17). The relevant portion of the decision in *Bernardo Footwear* also rests upon the conclusion that plaintiff should have discovered defendant's actions sooner; the discussion of a continuing cause of action was limited to the breach of contract claim. *Id.*

*(3) "fair descriptive use"*

Defendant appears to conflate two defenses here: descriptiveness and fair use. To the extent that Defendant attempts to argue that Plaintiff's mark is merely descriptive, that argument is discredited above, due to the incontestability and secondary meaning of the mark. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 189 (1985) ("The [Lanham] Act's language also refutes any conclusion that an incontestable mark may be challenged as merely descriptive."); *Pebble Beach*, 155 F.3d at 540 (A descriptive mark is protectible once it has acquired a secondary meaning).

Defendant argues that the fair use defense applies here, because he "uses 'just bulbs' fairly and in good faith only to describe the goods and services it provides to users: links which provide information regarding just bulbs." (Document No. 36 at 19). In response, Plaintiff argues that "the fair use defense is unavailable where the defendant uses a trademark for commercial purposes." (Document No. 37 at 12).

The Lanham Act provides as a defense to infringement: "That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark [] of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin." 15 U.S.C.A. § 1115(b)(4). "The 'fair-use' defense, in essence, forbids a trademark registrant to appropriate a descriptive term for his exclusive use and so prevent others from accurately describing a characteristic of their goods." *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1185 (5th Cir. 1980). In order to demonstrate a defense of fair use, the Defendant must be using the mark in a "nontrademark sense." *Galvotec Alloys, Inc. v. Gaus Anodes Int'l, LLC*, No. 7:13-CV-664, 2014 WL 6805458, at *12 (S.D. Tex. Dec. 2, 2014) ("[T]he defense 'allows [the defendant] to use a term in good faith to describe its goods or

services, but only in actions involving descriptive terms and only when the term is used in its descriptive sense rather than in its trademark sense.'") (citations omitted); McCarthy § 11:46 ("It is important to note that the only type of use which should suffice as a 'classic fair use' is use by defendant in a nontrademark sense."). "Often, an infringing trademark usage of the challenged term is evidenced by its employment as an 'attention-getting symbol.'" McCarthy § 11:46 (citing *Mobil Oil Corp. v. Mobile Mechanics, Inc.*, 192 U.S.P.Q. 744, 749 (D. Conn. 1976); *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 24 U.S.P.Q.2d 1001, 1007 (7th Cir. 1992); *Breuer Elec. Mfg. Co. v. Hoover Co.*, 47 Env't. Rep. Cas. 1705, 48 U.S.P.Q.2d 1705, 1998 WL 427595 (N.D. Ill. 1998)).

In this case, Defendant uses Plaintiff's trademark to attract attention from the public, because unwitting consumers will enter www.justbulbs.com into their web browser or search for "just bulbs," looking for Plaintiff's website. Defendant benefits from this, receiving more traffic than his website would otherwise. If Defendant truly intended only to provide "links which provide information regarding just bulbs," he could have used many other domain names to do so. (Document No. 36 at 19).

Other courts have found that the use of a mark in a web address is not descriptive, but constitutes use as a trademark, making the fair use defense inapplicable. *Namer v. Broad. Bd. of Governors*, No. CIV.A. 12-2232, 2013 WL 4875087, at *4 (E.D. La. Sept. 10, 2013), citing *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 104 (2d Cir. 2001).[12] *See also E. & J. Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 275 (5th Cir. 2002) (hereinafter "*Gallo*

---

[12] The Court explained that,

> Haar [the alleged infringer] uses the name "thechildrensplace.com" as the address, or name, of its website, and has similarly reserved all the other names in contention. This is not simply an adjectival use, as might be the case if Haar named his website otherwise, but referred to it in publicity materials as "a children's place." Haar's use is as a mark. It therefore cannot qualify for the protection of 15 U.S.C. § 1115(b)(4).

*TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 104 (2d Cir. 2001).

*Winery*") (In finding that the defendant's use of the domain name was commercial, and thus not fair use under the ACPA, the Court noted, "[f]urther, at least two other courts have found that when a defendant registers a domain name that is identical to someone else's trademarked name and thereby impacts the trademark owner's business by preventing internet users from reaching the trademark owner's own web site, this [] impacts the trademark owner's business and is a use 'in connection' with goods and services.") (citing *People for the Ethical Treatment of Animals v. Doughney,* 113 F. Supp. 2d 915, 919 (E.D. Va. 2000), aff'd 263 F.3d 359 (4th Cir. 2001); *Planned Parenthood Federation of America, Inc. v. Bucci,* 42 U.S.P.Q.2d 1430, 1435 (S.D.N.Y. 1997)). Because Defendant is using the Domain Name as a trademark, rather than merely descriptively, the fair use defense does not apply.

*Conclusion*

Plaintiff has demonstrated as a matter of law that Just Bulbs is a protectable mark, which is incontestable and has acquired secondary meaning in the eyes of the public. Furthermore, each of the defenses raised by Defendant is inapplicable in this case. However, a genuine issue of material fact remains as to the likelihood of confusion between Plaintiff's company and Defendant's website. Therefore both parties' motions for summary judgment as to trademark infringement are denied.

*Cybersquatting*

Plaintiff argues that Defendant has violated § 1125(d)(1)(A) of the Anti-Cybersquatting Piracy Act (the "ACPA"). The ACPA states that:

> (1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person--

> (i) has a bad faith intent to profit from that mark, including a personal name which is
> protected as a mark under this section; and
> (ii) registers, traffics in, or uses a domain name that--
>> (I) in the case of a mark that is distinctive at the time of registration of the domain
>> name, is identical or confusingly similar to that mark;

15 U.S.C.A. § 1125 (West). "To prevail on the merits of an ACPA claim, [a plaintiff] must show that 1) its mark is a distinctive or famous mark entitled to protection; 2) [defendant's] domain names are identical or confusingly similar to [the plaintiff's] mark; and 3) [defendant] registered the domain names with the bad faith intent to profit from them." *Texas Int'l Prop. Associates v. Hoerbiger Holding AG*, 624 F. Supp. 2d 582, 587 (N.D. Tex. 2009) (internal quotations and citations omitted).

As discussed above, "Just Bulbs" is a distinctive mark entitled to protection; it has incontestable status and has gained secondary meaning. Therefore the first prong is met. *Id.* Regarding the second element, Defendant does not contest that the Domain Name is identical to Plaintiff's trademark.

Finally, Plaintiff must demonstrate that Defendant "registered the domain names with the bad faith intent to profit from them." *Id.* "[A] court may consider nine non-exclusive factors when determining whether a defendant had a bad faith intent to profit." *Id.* at 588-589 (citing *TMI, Inc. v. Maxwell,* 368 F.3d 433, 436 (5th Cir. 2004)). The factors are:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by

creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

*Id*. at 589 (citing 15 U.S.C. § 1125(d)(1)(B)(i)). The Court will consider each factor in turn.

(I)

Plaintiff has a trademark in "Just Bulbs" which is registered, incontestable, and has attained secondary meaning. (Document No. 26 at 25). Defendant has no intellectual property rights in the name "Just Bulbs." This factor weighs in favor of Plaintiff.

(II)

Plaintiff states that "'Just Bulbs' does not identify Ricks," which Defendant does not contest. (Document No. 26 at 25; Document No. 36 at 13-15). This factor weighs in favor of Plaintiff.

(III)

Plaintiff states that "Ricks did not sell light bulbs before using the Domain Name," which Defendant does not contest. *Id*. This factor weighs in favor of Plaintiff.

(IV)

As discussed above, Ricks did not engage in *bona fide* non-commercial or fair use of the mark. This factor weighs in favor of Plaintiff. *Texas Int'l Prop.*, 624 F. Supp. 2d at 591 (fair use defense did not apply where defendant was using a domain name to provide advertising links for products associated with the plaintiff's mark). *See also Gallo Winery*, 286 F.3d at 275.

(V)

Plaintiff states that "Ricks' [intent] is demonstrated by his knowing and continuing violation of Just Bulbs' trademark rights." (Document No. 26 at 25). In response, Defendant states that he "has no intent to divert customers from the Plaintiff's online location to a site accessible under the Domain Name that could harm the goodwill represented by the Mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site." (Document No. 36 at 14). Defendant also adds that he "had no knowledge of the plaintiff at time of registration and is not in violation of any rights because of its fair use." *Id*.

Currently Defendant is intentionally infringing upon Plaintiff's mark. *Emerald City Mgmt., LLC v. Kahn*, No. 4:14-CV-358, 2016 WL 98751, at *14 (E.D. Tex. Jan. 8, 2016) ("Evidence of bad faith may arise well after registration of the domain name.") (citing *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1220 (9th Cir. 2010)). His awareness of Plaintiff's mark and its relationship to lightbulbs strongly suggests that he is attempting to "divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, […] for commercial gain." 15 U.S.C. § 1125(d)(1)(B)(i). Defendant's claims that this is not his intent are self-serving, and are unconvincing to the Court.

However, the Court cannot make credibility determinations on summary judgment, and therefore finds that this factor is neutral. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009).

### (VI)

Plaintiff states that "Ricks has engaged in a pattern of selling domain names without using, or intending to use, the domain names for bona fide offering of any goods or services." (Document No. 26 at 25). In response, Defendant states that he "has never offered to transfer, sell, or otherwise assign the Domain Name directly to Plaintiff or any third party for financial gain." (Document No. 36 at 14).[13]

Defendant's claim that he has not tried to sell this Domain Name to Plaintiff would typically weigh in his favor.[14] However, the fact that Defendant is "using the name for another source of monetary gain-- generating click-through advertising revenue" weighs against him. *Texas Int'l Prop.*, 624 F. Supp. 2d at 590. *See also Emerald City*, 2016 WL 98751, at *14 ("Courts have found bad faith intent to profit from a domain name even where the holder did not make an offer to sell the domain name.") (citing *Basile Baumann Prost Cole & Assocs., Inc. v. BBP & Assocs. LLC*, 875 F. Supp. 2d 511, 517 (D. Md. 2012)). Furthermore, the fact that he has offered other domain names for sale (and currently makes more money selling domains than from ads) suggests bad faith. *Gallo Winery*, 286 F.3d at 276; (Document No. 26, Exhibit B at 22:14-19, 23:20-25).

---

[13] Plaintiff asks that this claim be stricken from the record, because such evidence violates Federal Rule of Evidence 408. (Document No. 37 at 2). However Defendant's claim refers to a *lack* of a settlement offer. Furthermore, the Court is considering Defendant's statement as relevant to his bad faith under the ACPA, not "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408; *Zinner v. Olenych*, 108 F. Supp. 3d 369, 391 (E.D. Va. 2015). *But see Fairbanks Capital Corp. v. Kenney*, 303 F. Supp. 2d 583, 594 (D. Md. 2003).
Plaintiff also asks that other portions of Defendant's Memorandum be stricken from the record. (Document No. 37 at 2). However, as those sections are not relevant, the Court will not rule on those requests.

[14] Interestingly, Plaintiff does not bring up the fact that, at one point, there was a button on the website where one could make offers to purchase it, calling into question the veracity of Defendant's statement that he never attempted to sell the Domain Name. (Document No. 33-1 at 39:8-10; Document No. 26, Exhibit B-5, at 409).

(VII)

Plaintiff states that "Ricks has a pattern of using misleading contact information when applying for registration of domain names [for example, 'Motherboards.com,' 'Covanta.com,' and 'Gee Whiz Private WhoIs'] even if he allegedly does so for the purpose of protecting his privacy." (Document No. 26 at 25) (citing Document No. 26, Exhibit B, at 54:10-21, 59:7-22). In response, Defendant states that:

> [his] enrollment of commonplace privacy measures in registering the Domain Name does not rise to the provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct. It is common practice for owners of domain names to utilize whois privacy services as they are typically cheap or free and can maintain the privacy and security of both personal information and of loved ones. See Declaration of Gregory Ricks, ¶ 19.

(Document No. 36 at 14). However, Defendant does not cite any case law for this assertion, nor does he provide evidence that it is common practice to use privacy services, beyond his own statement. The Court agrees with Plaintiff that Defendant's pattern of providing misleading contact information, including in this case, weighs against him.

(VIII)

Plaintiff states that "Ricks has registered or acquired thousands of domain names with reckless disregard of whether they infringe on trademarks of others." (Document No. 26 at 25-6). In response, Defendant states that, while he has invested in thousands of domains, "[o]nly an inconsequential fraction coincidentally overlap with a registered trademark. There is no duty to search for a trademark before starting a business or registering a domain." (Document No. 36 at 15).

Despite Defendants' argument that only a small amount of his domains overlap with a registered trademark, the fact remains that Defendant has acquired or registered several domain

names which are clearly "identical or confusingly similar to marks of others." Examples include the following domain names: "hpshoping.com,[15]" "pocketmac.com," "playboybunny.com," "WWF.com," "Wharton.com," and "poe.com." (Document No. 26, Exhibits C-1 through C-17, Exhibits D-1 through D-20). Some of these marks are so famous that any argument by Defendant that he was merely an investor in domain names, that he was unaware of his infringement upon their trademarks, or that it was a coincidence, is unbelievable. *See Texas Int'l Prop.*, 624 F. Supp. 2d at 590 (discounting argument that company "registered numerous domain names because they are 'valuable internet property,'" not because they were trademarked terms). In other cases, domain names purchased by the Defendant are so specific that they suggest prior knowledge of trademark terms. Examples include "Marshalsylver.com," "Datecheck.com," and "Lexingtonmedicalgroup.com." (Document No. 26 at 21, citing Exhibits C-13, C-16, and D-13). Lastly, Plaintiff is correct that Defendant's failure to check the PTO before using domain names was "at his own peril," because "the filing of the application to register such mark shall constitute constructive use of the mark, conferring a right of priority." 15 U.S.C.A. § 1057. This factor suggests bad faith.

(IX)

The parties agree that Plaintiff's mark is not famous. (Document No. 26 at 26; Document No. 36 at 15). This factor weighs against Plaintiff. *Texas Int'l Prop.*, 624 F. Supp. 2d at 591.

Overall, seven of the nine factors suggest bad faith on the part of the Defendant. However, the Court does not "simply count up which party has more factors in its favor after the

---

[15] Omitting the second "p" in shopping is known as "typosquatting," where a party uses a domain name containing a typo or intentional misspelling of distinctive or famous names. *Texas Int'l Prop. Associates v. Hoerbiger Holding AG*, 624 F. Supp. 2d 582, 587 (N.D. Tex. 2009). Any argument that Defendant was unaware of HP's trademark is particularly absurd here, as there is no other reason to intentionally purchase a domain name with a typo.

evidence is in," but must consider the "totality of the circumstances." *Id.* at 590-1. In this case the Court finds that Plaintiff has conclusively demonstrated that Defendant acted in bad faith under the ACPA. An overwhelming majority of the factors suggest bad faith, and the Court is particularly convinced that Defendant's egregious pattern of cybersquatting shows bad faith. The prior WIPO decisions are also relevant to the "totality of the circumstances," because they clearly demonstrate that Defendant knew or should have known that his conduct was illegal, but continued to use his website to advertise lightbulbs.

Furthermore, the safe harbor under the ACPA does not apply to Defendant, as Defendant did not believe or have reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful. 15 U.S.C. § 1125(d)(1)(B)(ii). The safe harbor "provides a narrow berth for fair use arguments." *S. Co. v. Dauben Inc.*, 324 F. App'x 309, 317 (5th Cir. 2009). As described above, the fair use defense clearly does not apply to Defendant's use of the Domain Name. Furthermore, after the second WIPO decision, Defendant had constructive notice that his use was not protected by the fair use doctrine, but continued to infringe. This was clearly unreasonable, and bars the application of the safe harbor.[16]

*Conclusion and Damages*

Plaintiff has demonstrated as a matter of law that Defendant has violated the ACPA; therefore its Motion for Summary Judgment (Document No. 26) is granted regarding this claim. *See Gallo Winery*, 286 F.3d at 276; *Texas Int'l Prop.*, 624 F. Supp. 2d at 591. Plaintiff requests that the Court transfer the Domain Name to Plaintiff, and that the Court award statutory damages of $100,000. (Document No. 26 at 26-27). However, the Court will address appropriate remedies for Defendant's violation of the ACPA at the conclusion of the entirety of the litigation.

---

[16] Defendant's extensive involvement in litigation regarding cybersquatting and trademarks also suggests that he did not have a reasonable belief that his use of the Domain Name constituted fair use.

*Texas Anti-Dilution Statute*

Both parties cite to Tex. Bus. & Com. Code § 16.29 in their discussions of liability for dilution under Texas law. However, neither party appears to be aware that this statute was recodified as Tex. Bus. & Com. Code § 16.103, in order to "make the Texas dilution standard 'substantially consistent' with federal law, including changing the dilution analysis so that only 'famous'—as opposed to 'distinctive'—marks received protection from dilution." *US Risk Ins. Grp., Inc. v. U.S. Risk Mgmt., LLC*, No. 3:11-CV-2843-M-BN, 2013 WL 4504754, at *20 (N.D. Tex. Aug. 20, 2013) (citing Notes to Tex. Bus. & Com. Code § 16.103). *See also Galvotec Alloys*, 2014 WL 6805458, at *10. Plaintiff's mark is admittedly not famous; therefore Defendant cannot be liable for dilution under Texas law. (Document No. 26 at 26). This claim is dismissed.

**Conclusion**

The Court hereby

ORDERS that both parties' motions for summary judgment (Document Nos. 26, 33) regarding the trademark infringement claim are DENIED;

Plaintiff's Motion for summary judgment regarding the ACPA claim is GRANTED and Defendant's Motion regarding the ACPA claim is DENIED; and

Defendant's Motion regarding the dilution claim is GRANTED and Plaintiff's Motion is DENIED. Plaintiff's claim of dilution under Texas law is hereby DISMISSED.

SIGNED at Houston, Texas, this 10th day of August, 2016.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE